**Lori PETTIT, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**RETRIEVAL MASTERS CREDITORS BUREAU, INC. and Russell Fuchs, Defendants.**

**No. 98 C 1154.**

United States District Court, N.D. Illinois, Eastern Division.

March 10, 1999.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Ignacio Daniel Maramba, Edelman & Combs, Chicago, IL, Charley Hoon Lee, Edelman & Combs, Chicago, IL, for plaintiff.

George William Spellmire, David Matthew Schultz, John Matthew Foley, Matthew R. Henderson, Hinshaw & Culbertson, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

PALLMEYER, District Judge.

Plaintiff Lori Pettit ("Pettit") filed this class action complaint on February 24, 1998, against Defendants Retrieval Masters Creditors Bureau, Inc. ("RMCB") and RMCB's owner, Russell Fuchs ("Fuchs"), alleging that the Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e, 1692e(10), 1692e(16) ("FDCPA") when they sent her a collection letter requesting payment on behalf of a company from which she had ordered merchandise. Pettit claims that the Defendants' use of the name "Creditors Bureau," along with references to her "file" and to the "National Delinquent Debtor File" ("NDDF") falsely suggest that RMCB is a credit bureau. Furthermore, she alleges that references in the letter to the NDDF in the letter falsely convey the

impression that a debtor will face serious consequences for continued non-payment.

The parties filed cross-motions for summary judgment. Pettit's motion for partial summary judgment asserts that the text of the collection notice violates the FDCPA. In addition, Plaintiff argues that not only RMCB, but Fuchs also is liable as a matter of law for choosing the allegedly misleading name of the company and allowing the continued use of the name.

Defendants RMCB and Fuchs filed separate motions for summary judgment. Fuchs' motion is based on the proposition that he is neither a debt collector, nor personally involved in the alleged offending behavior and thus cannot be personally liable for the actions of the corporation. RMCB argues that it did not violate the FDCPA because the name of the company is not misleading to the unsophisticated consumer and because reference to the NDDF in the collection letter does not deceptively indicate that the consumer will face serious consequences for a failure to pay.

### FACTS

#### August 12, 1997 letter to Plaintiff

Plaintiff Lori Pettit owed $20.70 to an entity known as Crafting and Decorating Made Simple for literature she ordered from that company. (Defendants' Joint Rule 12(m) Statement (hereinafter "Defendants' 12(m)") ¶ 8.) Despite repeated requests, Pettit did not make payment, so Crafting and Decorating Made Simple turned the matter over to RMCB. On August 12, 1997, RMCB sent Pettit a letter in which it requested payment on behalf of Crafting and Decorating Made Simple. (*Id.* ¶ 8.) The letter, dated August 12, 1997, reads as follows:

NOTICE BEFORE DEBTOR FILE NOTIFICATION [surrounded by asterisks]

Dear L PETTIT:

For an amount of $20.70, are you willing to let Crafting and Decorating Made Simple record your name on a delin-quent debtor file, computerized on a national basis?

You have had ample opportunity to explain why you have not paid our client, Crafting and Decorating Made Simple, for the order shipped to you.

It is essential that you mail payment in full by 09/12/97.

Remember, your account is now being handled by debt collectors who want to see this matter resolved. Clear your record with us once and for all. Remit the $20.70 owed and keep Crafting and Decorating Made Simple from putting your name on the National Delinquent Debtor File, which could affect your ability to obtain certain types of credit with direct marketing companies.

SINCERELY

/s/ Joseph Howard

JOSEPH HOWARD

COLLECTION MANAGER

(*Id.* ¶ 11; Collection Letter, Ex. A to Plaintiff's Complaint.) The front of the letter includes a notice to "SEE REVERSE FOR IMPORTANT INFORMATION"; the information on the reverse is a statement in light type: "This is an attempt to collect a debt. Any information obtained will be used for that purpose. This communication is from a debt collector. New York City Department of Consumer Affairs License Number 808906." (Collection Letter, Ex. A to Plaintiff's Complaint) (original quotation marks omitted.)

At her deposition, Pettit initially acknowledged that she knew the letter was from a collection agency, but went on to testify that she was misled by the letter and thought the letter was from a credit bureau. (Defendants' 12(m) ¶ 43.) She cited Defendant's name and the contents of the letter as her basis for this belief:

Q. Did you know who sent you the letter?

A. Yes.

Q. Who is that?

A. Retrieval Masters Creditors Bureau.

Q. And you knew they were a debt collector, didn't you?

A. Yes.

Q. You didn't think that Retrieval Masters Creditors Bureau was a credit bureau, did you?

A. Yes, I did.

Q. Why did you think that?

A. Because it states that in the letter.

Q. What does it state?

A. It says that they will put me on a National Delinquent Debtor File, so I thought I would never get credit again.

Q. What is it about the statement that made you think that you would never get credit again?

A. Delinquent debtor. It says you don't get certain types of credit.

 * * * * * *

Q. When you received this letter in August of 1997, what about the letter made you think that it was from a credit bureau?

A. The name Creditors Bureau.

Q. Is that the only thing?

A. Yes.

Q. But you also knew it was from a debt collector, right?

A. I thought they were the same.

(Pettit Dep. at 11–12, 25; Ex. L to Appendices to Plaintiff's Motion For Partial Summary Judgment.)

RMCB sent the letter on its letterhead which displays the letters "RMCB" in bold face and smaller, non-bolded words, "COLLECTION AGENCY," beneath those letters in the upper left corner. (Defendants' 12(m) ¶ 9; Collection Letter, Ex. A to Plaintiff's Complaint.) Across the middle of the letterhead is the full name of the company: "RETRIEVAL MASTERS CREDITORS BUREAU" in capital letters; its address, 2269 Sawmill River Rd., Bldg. 3, Elmsford, NY, 10523; and its phone number, 914–345–7136. (Defendants' 12(m) ¶ 10; Collection Letter, Ex. A to Plaintiff's Complaint.) The upper right hand corner features a small version of the seal of the American Collectors Association. (Defendants' 12(m) ¶ 10; Collection

Letter, Ex. A to Plaintiff's Complaint.) The letters "RMCB" in the upper left corner are the most prominent feature of the letterhead.

### History of RMCB

Defendant Russell Fuchs and his brother Ira Fuchs founded RMCB, a collection agency, under the name Retrieval Masters Credit Bureau in 1977. (Defendants' 12(m) ¶¶ 55, 59.) Russell Fuchs testified that it was Ira who selected the name Retrieval Masters Credit Bureau. (Fuchs' Dep., at 18.) Russell and Ira Fuchs each owned 37.5% of the outstanding shares, and a man named Joseph Schiff owned the remaining stock. (Plaintiff's Statement of Material Facts (hereinafter "Plaintiff's 12(m)") ¶ 10.) The company originally had four employees, including Ira and Russell Fuchs and Joseph Schiff. (Id. ¶ 10.)

In 1979, the Federal Trade Commission ("FTC") suggested that the company change its name. (Defendants' 12(m) ¶ 60.) Russell Fuchs testified that he does not know why the FTC made the request. (Defendants' 12(n) ¶ 14.) Fuchs further stated in his deposition that he does not recall being involved in the name change to Retrieval Masters Creditors Bureau. (Plaintiff's 12(n) ¶ 61; Fuchs dep., at 19, 28–29.)

In compliance with New York incorporation laws, the corporation filed a Certificate of Amendment of Certificate of Incorporation ("Certificate of Amendment") to officially change the name of the company to Retrieval Masters Creditors Bureau in compliance with the New York incorporation laws. A portion of the Certificate of Amendment states that the amendment to the name "was authorized by the unanimous vote of the holders of all the issued and outstanding shares entitled to vote at a meeting of the shareholders on May 3, 1979." (Plaintiff's 12(m) ¶ 15; Certificate of Amendment, Ex. H to Appendices to Plaintiff's Motion For Partial Summary Judgment.) The signatures on the Certificate of Amendment are those of Ira Hayes Fuchs, President, and Joseph Schiff, Sec-

retary. (Certificate of Amendment, Ex. H to Appendices to Plaintiff's Motion For Partial Summary Judgment.) Russell Fuchs does not recall being present at a meeting to discuss the name change or voting for a name change (Fuchs Dep., at 28–29), and his signature does not appear on the Certificate of Amendment. (Defendants' 12(n) ¶ 15; Certificate of Amendment, Ex. H to Appendices to Plaintiff's Motion For Partial Summary Judgment.)

### Fuchs' Involvement with RMCB

Russell Fuchs currently has sole ownership of RMCB. (Plaintiff's 12(m) ¶ 11.) He is the president and treasurer of the corporation (*id.* ¶ 5), and, as sole equity owner, he is able to authorize an official name change of RMCB. (*Id.* ¶ 19.) Fuchs stated that he "likes" the name Retrieval Masters Creditors Bureau. (*Id.* ¶ 17.) At his deposition, Fuchs admitted that he could authorize anything for the company, but testified that he does not currently have much involvement with RMCB and has delegated authority for running the corporation to RMCB's officers and directors. (Defendants' 12(n) ¶ 7, Fuchs Dep., at 53–55, 58, 63–64, 68–69.) RMCB has 75 employees. (Fuchs Dep., at 17.)

Fuchs daily receives information from officers and directors about "big picture" concerns such as finances, clients, and capital investments (Defendants' 12(m) ¶ 80), but Fuchs does not have regular meetings with the officers and directors. (*Id.* ¶ 83.) RMCB has employees who are responsible for ensuring that RMCB complies with the FDCPA (*id.* ¶ 73); but Fuchs himself does not monitor FDCPA compliance. (*Id.* ¶ 75.) In fact, Fuchs is ordinarily not informed about FDCPA litigation involving RMCB. (*Id.* ¶ 90.) Fuchs and his attorney

did meet with FTC personnel in 1997 to discuss certain language in RMCB's collection form letters. (Plaintiff's 12(m) ¶ 20.) At that meeting, FTC staff made suggestions for modification of the language in these letters, suggestions that Fuchs turned over to RMCB employees for implementation. (Defendants' 12(n) ¶ 20.)

Fuchs emphasized the limited nature of his involvement with RMCB's activities. For example, he does not personally "deal with" the company that operates the National Delinquent Debtor File referred to in the collection letter. (Defendants' 12(m) ¶ 85, citing Fuchs' Dep. at 80.) Fuchs testified that he is not sure what the NDDF does, although he knows that RMCB's clients recommended use of the NDDF. (Fuchs Dep., at 80–82.) Fuchs does not make decisions about hiring and firing employees and does not train them. (Defendants' 12(m) ¶¶ 79, 82.) In fact, Fuchs' involvement in RMCB has decreased to the point where he is only in the office two days a week. (*Id.* ¶ 81.) When he is in the office, Fuchs spends much of his time on personal tasks such as sending e-mail and checking stock quotes. (Defendants' 12(n) ¶ 7.)

The parties disagree as to whether the corporation has other officers or directors besides Fuchs. Although Plaintiff insists that Fuchs is the only officer of RMCB (Plaintiff's 12(n) ¶¶ 62–63, 67, 70, 72, 77–78, 83), she contradictorily admits that Jeff Wollman ("Wollman") serves as chief operating officer for RMCB. (*Id.* ¶ 68.) Fuchs claims that the corporation has several other officers and directors, including directors of sales and marketing. (Defendants' 12(n) ¶ 6.) [1]

---

1. The confusion apparently stems from Fuchs' deposition while being questioned by the Plaintiff's attorney:

   Q. You testified earlier that you were the president and maybe the treasurer of RMCB currently?

   A. Yes.

   Q. Do you know if there are any other officers or directors?

   A. There are none.

   [Discussion verifying that the corporation does not have any vice presidents.]

   Q. Is there someone that you consider to do the duties of a vice president?

   A. There are no vice presidents in my organizations. There are chief operating officers, chief financial officers and directors of sales and marketing. There are information system managers.

   (Fuchs' Dep. at 33–34.)

Fuchs has delegated the day-to-day operation of the business to Wollman, including all policies and procedures and supervision of the employees. (Defendants' 12(m) ¶ 69.) Wollman and other officers are responsible for reviewing, drafting, and revising RMCB collection notices. (*Id.* ¶ 70; Fuchs Dep., at 46; Wollman Dep., at 30.) RMCB employees select the letterhead for collection notices. (Defendants' 12(m) ¶ 64.) Although Fuchs is "generally aware" of the collection form letters used by RMCB (*Id.* ¶ 65), he is not involved in drafting or reviewing the letters. (*Id.* ¶ 67.)

### RMCB's Reliance on the National Delinquent Debtor File

Plaintiff alleges that RMCB's reference to the National Delinquent Debtor File in the collection letter falsely suggests that the debtor will face "serious" consequences for continued non-payment. The NDDF referred to in the demand letter is a collection of records identifying consumers who have had a history of slow payments or who have been written off by direct marketers. A company named The Credit Index, L.L.C., maintains the records. (Defendants' 12(m) ¶ 15.) The Credit Index is not a credit bureau that provides credit information for mortgage applications or credit cards, but a consumer reporting agency within the definition of the Fair Credit Reporting Act.[2] (Plaintiff's 12(m) ¶ 30; Defendants' 12(n) ¶ 30.) The Credit Index maintains a computer data base listing of consumer names and addresses, along with the amounts due and the names of the creditor. (Defendants' 12(m) ¶ 18.) Positive credit information, such as a record of prompt payment, is not included. (Plaintiff's 12(m) ¶ 40.) Direct marketing companies and collection agencies furnish the information for the data base; in exchange for this information, the Credit Index permits companies to use the trade name "National Delinquent Debtor

File" in their collection letters to debtors. (*Id.* ¶ 20.) The data base is not affiliated with the federal government. (Defendants' 12(m) ¶ 26.) The data base encompasses all 50 states and the number of records maintained is proportionate to the population of those states. (*Id.* ¶ 27.)

Direct marketing companies attempt to avoid contacting individuals who pose a credit risk. (*Id.* ¶ 30.) To do so, at least 75 to 80 percent of the direct marketing industry uses the Credit Index's services. (*Id.* ¶¶ 43, 49.) According to the deposition testimony of Carl Tomasello, an employee of the Credit Index, direct market companies use the information maintained by the Credit Index for "list screening" or "order screening," but not for purposes of mortgages, car loans, large credit amounts, or revolving credit. (Plaintiff's 12(m) ¶ 31.) "List screening" is a process in which a direct marketer submits a list of individuals to the Credit Index before contacting the individuals by telephone or mail. The Credit Index removes any individuals from the list who may pose a potential credit risk. (*Id.* ¶ 29.)

In the "order screening" process, a marketer who has received an order from an individual who was not contacted by direct marketing (*i.e.*, a telemarketing call or a direct mailing) will submit the name of the individual to Credit Index. (*Id.* ¶ 33.) Credit Index will check the NDDF for information about the consumer. (*Id.* ¶ 34.) A creditor may require an individual with a credit risk to pay for goods in advance, or to clarify the information in the Debtor File. In approximately 90% of the cases, however, the creditor declines to accept an order from the individual. (*Id.* ¶¶ 35–36.) Between 200,000 and 300,000 orders are checked against the data base per week during peak times. (*Id.* ¶ 38; Plaintiff's 12(n) ¶¶ 29, 33–36, 38.)

---

**2.** Under the FDCPA, a consumer reporting agency is defined as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties ...." 15 U.S.C. § 1681a(f).

RMCB has done business with the Credit Index for many years and regularly sends negative information about debtors for inclusion into the data base. (Defendants' 12(m) ¶¶ 40–41.) In the August 12, 1997, letter, RMCB warned Pettit that if RMCB sent information about her to the Credit Index, it "could affect her ability to obtain certain types of credit with direct marketing companies." (Collection Letter, Ex. A to Plaintiff's Complaint.)

## DISCUSSION

### A. Standard for Grant of Summary Judgment

Summary judgment should be granted when the evidence indicates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court will construe "the evidence in the light most favorable to the nonmoving party and draw[ ] all reasonable inferences in its favor." *Aubert v. American General Fin., Inc.*, 137 F.3d 976, 977 (7th Cir.1998). When both parties seek summary judgment, the court will "look to the burden of proof that each party would bear on an issue of trial; [the court] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997).

### B. Fuchs is not personally liable for the alleged misconduct of RMCB

▮ Russell Fuchs argues that he is not liable for RMCB's alleged violations of the FDCPA. Under the FDCPA, a "debt collector" may not use "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The FDCPA applies only to debt collectors, defined in the FDCPA as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly,

debts owned or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). An owner, officer of a corporation, or shareholder may be held personally liable for the corporation's violation of FDCPA only "if he or she personally violated the [FDCPA], i.e. the defendant cannot be held vicariously liable for statutory violations committed by the corporations' collection agents or some other employee." *Perovich v. Humphrey*, No. 97 C 3209, 1997 WL 674975, *2 (N.D.Ill. Oct.28, 1997).

▮ Fuchs argues that he cannot be held liable for RMCB's activities under these standards. Fuchs himself does not fit the statutory definition of a debt collector; he does not regularly attempt to collect debts owed to his clients and is only involved in "big-picture" issues at RMCB such as capital investments and finances. (Defendants' 12(m) ¶ 80.) Furthermore, Fuchs is not personally involved with the behavior that allegedly violates the FDCPA.

Pettit cites several cases in support of her claim against Fuchs, but the court finds these distinguishable. For example, Plaintiff cites *West v. Costen*, 558 F.Supp. 564 (W.D.Va.1983) for the rule that "[a]n officer of a corporation cannot be held personally liable for the wrongful conduct of the corporation's employee's [sic] absent personal involvement with the conduct." *Id.* at 585. The *West* court held that even though the president of a debt collection agency was a debt collector, he was not personally liable for the wrongful conduct of the company's employees where there was no evidence of his own involvement in the conduct. *Id.* The court did ultimately hold the president liable under a veil piercing theory, but Pettit has not pursued such a theory. As in *West*, she has offered no evidence that Fuchs is personally involved in drafting, approving, or reviewing the collection letter in question.

In *Drennan v. Van Ru Credit Corp.*, 950 F.Supp. 858 (N.D.Ill.1996), the court held that the plaintiff stated a cause of action against an executive officer of a collection

agency for violations of the FDCPA where, in contrast to Fuchs, he "direct[ed] the policies, practices and operations," *id.* at 859, and was "involved in the creation and modification of form letters, the most critical part of the debt collection operation." *Id.* at 861 n. 7. The court in *Egli v. Bass,* No. 98 C 2001, 1998 WL 560270 (N.D.Ill. Aug.26, 1998), held that the owner of a debt collection agency could be personally liable where she devised and implemented the procedures of the company and personally approved the offending letter. *Id.* at *2. *See also Pope v. Vogel,* No. 97 C 1835, 1998 WL 111576, *5 (N.D.Ill. Mar.5, 1998) (denying motion to dismiss because one who directly and regularly attempts to collect debts is a debt collector); *Slater v. Credit Sciences, Inc.,* No. 98 C 0769, 1998 WL 299803, *2 (N.D.Ill., May 29, 1998) (denying motion to dismiss where plaintiff alleged individual defendant's personal involvement); *Pikes v. Riddle,* 38 F.Supp.2d 639, 639 (N.D.Ill.1998) (denying motion to dismiss where complaint made allegations of individual defendant's personal involvement).[3]

Courts in other districts have also looked to see whether the owner or president is actively and personally involved in alleged FDCPA violations. In *Teng v. Metropolitan Retail Recovery, Inc.,* 851 F.Supp. 61 (E.D.N.Y.1994), for example, the president and manager of a debt collection company violated the FDCPA by calling the debtor five times in one day, and by telling the debtor on different occasions that there was a judgment against him, that there was a family emergency, and that the collection agent was from the "City Marshall's office." *Id.* at 63–65. The court held that the president and manager could each be "jointly and severally liable for the damages incurred by the

plaintiff" because they "actually made the actionable phone calls." *Id.* at 67. Fuchs did not make phone calls in an attempt to collect debt; he did not write, review, or directly approve the offending collection letter; he did not choose the letterhead; nor does he recall being involved in the selection of RMCB's name.

Similarly, in *Ditty v. CheckRite,* 973 F.Supp. 1320 (D.Utah 1997), the court held that the sole attorney in a law firm that specialized in debt collection could be personally liable because he was "intimately involved with the unlawful collection practices of his firm." *Id.* at 1336–37. Specifically, the attorney wrote the offending form letters used by the firm, supervised all of the firm's collection activities, trained the firm's employees, and created a "covenant not to sue" scheme that violated the FDCPA. *Id.* at 1324–25.

The court in *Newman v. Checkrite,* 912 F.Supp. 1354 (E.D.Cal.1995), held that an attorney at a law firm could be held personally liable for violations of the FDCPA where he wrote false and misleading letters and was "directly involved in the day-to-day operations" of the firm. *Id.* at 1372. The daily operations included "training and managing employees and reviewing or supervising the review of all accounts." *Id. See also Zhang v. Haven–Scott Assoc.,* No. Civ.A 95–2126, 1996 WL 355344, *9 n. 12 (E.D.Pa. June 21, 1996) (allegations of personal involvement by individual defendants sufficient to withstand motion to dismiss FDCPA case).

Fuchs is not directly or intimately involved with the day-to-day operations of RMCB. He is only in the office two days a week because he has delegated his authority to his chief operating officer. Fuchs

---

**3.** The court is not persuaded by Plaintiff's lengthy string cites to non-FDCPA cases which are not factually similar to this case: *Federal Trade Comm'n. v. Amy Travel Service,* 875 F.2d 564 (7th Cir.1989) (sales of vacation vouchers); *Guziak v. Federal Trade Comm'n.,* 361 F.2d 700 (8th Cir.1966) (false representations in advertising); *Federal Trade Comm'n. v. International Diamond Corp.,* 1983–2 Trade

Cas. (CCH) ¶ 65,506, at p. 68,458, 1983 WL 1851 (N.D.Cal.1983); *Federal Trade Comm'n. v. H.N. Singer, Inc.,* 1982–83 Trade Cas. (CCH) ¶ 65,011 (N.D.Cal.1982). Nor does the Court find it necessary to consider trademark cases by analogy as the Plaintiff suggests, because ample authority exists about FDCPA cases and individual defendant liability.

does not supervise, train, or hire employees. (Defendants' 12(m) ¶¶ 79, 82.) He was not actively, intimately, or personally involved in the choice of the name Retrieval Masters Creditors Bureau, and does not recall discussing or approving of the 1979 name change. (Defendants' 12(m) ¶ 58; Defendants' 12(n) ¶ 15; Plaintiff's 12(m) ¶ 17.) Notably, the twenty-year-old Certificate of Amendment of Certificate of Incorporation filed by the corporation in connection with the name change was not even signed by Fuchs. Fuchs did not write or review the collection form letter in controversy, nor did he choose the letterhead. (Defendants' 12(m) ¶¶ 64, 67, 70.) Fuchs does not do business personally with the Credit Index, the company that maintains the NDDF. (*Id.* ¶ 85.) Fuchs has delegated responsibility for FDCPA compliance to his employees. (*Id.* 73.) While Fuchs did attend a meeting with the FTC about the content of RMCB's form collection letters (Plaintiff's 12(m) ¶ 20), RMCB employees implemented the suggested changes. (Defendants' 12(n) ¶ 20.) Furthermore, although Fuchs admits to having the power to exercise authority over the activities at RMCB, Plaintiff has presented no evidence to rebut his assertion that he has never exercised that authority to any degree.

Fuchs is not liable for RMCB's debt collection activities. His motion for summary judgment is granted and Plaintiff's cross motion for summary judgment is denied.

### C. RMCB's use of the National Delinquent Debtor File does not violate the FDCPA

The Seventh Circuit in *Gammon v. GC Services*, 27 F.3d 1254 (7th Cir.1994), declared that the standard for determining whether a communication violates the FDCPA is from the eyes of the "unsophisticated consumer." *Id.* at 1257; *Avila v. Rubin*, 84 F.3d 222, 226 (7th Cir.1996). This "standard protects the consumer who is uninformed, naive, or trusting, yet it admits an objective element of reasonableness." *Gammon*, 27 F.3d at 1257. Thus,

"the standard is low, close to the bottom of the sophistication meter." *Avila*, 84 F.3d at 226. However, "[t]he reasonableness element in turn shields complying debt collectors from liability for unrealistic or peculiar interpretations of collection letters." *Gammon*, 27 F.3d at 1257.

Pettit first argues that the reference to the National Delinquent Debtor File in RMCB's collection letter falsely suggests "serious" consequences will result from being placed on it. Under the FDCPA, "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt ..." is prohibited. 15 U.S.C. § 1692e(10).

Pettit correctly states that collection letters violate the FDCPA when the letters threaten drastic action or serious consequences if the sender does not intend to fulfill the threats. *United States v. National Fin. Servs., Inc.*, 98 F.3d 131 (4th Cir.1996) (threatening to sue without intent to follow through with suit); *Bentley v. Great Lakes Collection Bureau, Inc.*, 6 F.3d 60 (2nd Cir.1993) (no intent to sue); *West v. Costen*, 558 F.Supp. 564 (W.D.Va. 1983) (collector threatened criminal charges but had never sought charges); *United States v. Central Adjustment Bureau, Inc.*, 667 F.Supp. 370 (N.D.Tex.1986) (collector falsely represented that debtor would be arrested); *Florence v. National Systems*, No. C82–2020A (N.D.Ga.1983) (Ex. H to Appendices to Plaintiff's Motion For Partial Summary Judgment) (collection company threatened adverse effect on credit rating but had no influence over credit rating). Plaintiff also correctly cites pre-FDCPA FTC cases in which the collection agency did not intend to take the action or follow through with the threat. *See In Re Reader's Digest Ass'n*, 63 FTC 1653 (1963); *In Re Pocket Books, Inc.*, 65 FTC 896 (1964); *In re Conde Nast Publications*, 65 FTC 906 (1965).

The case at bar is easily distinguishable from those cases, however. RMCB had a long-term business relationship with the Credit Index and fully in-

tended to turn Pettit's name over to the Credit Index if she did not pay. (Defendants' 12(m) ¶¶ 40–41.) Plaintiff argues that the reference to the NDDF falsely indicates that serious consequences will result from not paying. In this Court's view, however, RMCB's statements are not false; the letter correctly states the risk faced by debtors from having their names placed on the list.

The actual text of that portion of the letter states: "Remit the $20.70 owed and keep Crafting and Decorating Made Simple from putting your name on the National Delinquent Debtor File, which could affect your ability to obtain *certain types of credit* with *direct marketing companies.*" (Collection Letter, Ex. A to Plaintiff's Complaint) (emphasis added). The letter clearly states that only certain types of credit with direct marketing companies are affected by being on the list. This court agrees with its colleague, Judge Plunkett, who considered similar language recently and observed, "Even an unsophisticated consumer knows the difference between a mail order [or direct marketing] company, on the one hand, and banks, credit card companies, mortgage companies and car dealerships, on the other." *Arango v. GC Services, LP.*, No. 97 C 7912, 1999 WL 58550, *3 (N.D.Ill. February 3, 1999). *See Young v. Meyer & Njus,* 953 F.Supp. 238, 240 (N.D.Ill.1997) ("the Court need not consider the debtor to be a fool or an idiot.") On the other hand, the letter accurately states that relatively serious consequences may flow from having one's name on the list: if the consumer prefers to order goods through the mail, he or she will not receive information about buying opportunities, (Defendants' 12(m) ¶ 29), or a mail order company may refuse to fill an order. (*Id.* ¶¶ 35–36.)

Plaintiff next argues that the reference to the National Delinquent Debtor File falsely implies that the consumer's name will be referred to a credit bureau. The only case Pettit cites (and quotes exten-

sively) to support this contention is *Trull v. GC Services Ltd. Partnership,* 961 F.Supp. 1199 (N.D.Ill.1997). In *Trull,* the collection letter in question informed the debtor that "[t]his is the last effort I will be making to settle your account. ... [y]our name will be retained as part of our records along with others who, despite their good name and reputation, have shirked their payment responsibility." *Id.* at 1202. The letter continued, "We are anxious to clear your record as well as ours." *Id.* The letter then notified the recipient that "your account has been transferred from BMG Music Service to GC Services' Agency Master Debtor File," in capital letters. *Id.* The court found that an unsophisticated consumer could read those statements as implying "that GC operates a consumer reporting agency that assembles consumer credit information for the purpose of furnishing consumer reports to third parties." *Id.* at 1203.

The *Trull* case is distinguishable because the NDDF actually is an agency that assembles information to distribute to third parties, whereas GC Services, the defendant in *Trull,* was not a consumer reporting agency. The RMCB letter states explicitly that it will only affect "certain types of credit with direct marketing companies." (Collection Letter, Ex. A to Plaintiff's Complaint.) This statement is technically accurate and, as noted earlier, is not confusing even to an unsophisticated consumer. Nor is the court troubled by Plaintiff's assertion that RMCB falsely insinuates that the debtor's name will be turned over to a credit bureau. As the Defendant points out, the NDDF is a consumer reporting agency, as defined under 15 U.S.C. § 1681f, and does perform the same functions as a credit bureau. There is, therefore, nothing improper about this reference in the letter.

■ Finally, Plaintiff argues that the use of the National Delinquent Debtors File conveys the false impression that it is affiliated with the U.S. Government.[4] Pet-

---

4. The Plaintiff does not cite to 15 U.S.C. § 1692e(1) which prohibits "the false representation or implication that the debt collector is vouched for, bonded by, or affiliated

tit again cites cases that are distinguishable from the instant case or that do not support her contention. For example, in *Gammon*, a collection letter stated, "We provided the systems used by a major branch of the federal government and various state governments to collect delinquent taxes .... You must surely know the problems you will face later if you do not pay." 27 F.3d at 1255. The court held that the collection agency "appears to have implied that its development of governmental 'systems' for the collection of delinquent taxes would enable it to cause 'problems' for the delinquent debtor." *Id.* at 1258. The letter "may have violated the provisions of § 1692e" by leading an "unsophisticated consumer ... [to] reasonably believe that his future 'problems' would be with 'a major branch of the federal government' because of GC Services' development of the government's 'systems.'" *Id. See Slough v. Federal Trade Comm'n.*, 396 F.2d 870 (5th Cir.1968) (debt collector used the name "State Credit Control Board" and deceptive practices); *Adams v. First Federal Credit Control, Inc.*, No. 91 CV 2467, 1992 WL 131121 (N.D.Ohio May 21, 1992) (using the name "First Federal Credit Control" plus a letterhead that resembled the seal of the United States and a bald eagle violated the FDCPA); *Bennett v. Federal Trade Comm'n.*, 200 F.2d 362 (D.C.Cir.1952) (using name "National Service Bureau, Washington, D.C." as return address); *Floersheim v. Federal Trade Comm'n.*, 411 F.2d 874 (9th Cir.1969) (using Washington, D.C. as return address and legal type to simulate government documents exploited consumers' assumption that documents from Washington, D.C. are from the United States government).

In this case, besides the word "national," nothing in the letter explicitly or implicitly indicates that the data base is affiliated with the government. "National" indicates that the data base has information from all fifty states; even an unsophisticated consumer is not likely to assume that the government must be involved in a private attempt to collect a private debt when the letter does not refer explicitly or implicitly to the government. Plaintiff has not supported her contention through either facts or case law.

### D. RMCB's use of the name "Retrieval Masters Creditors Bureau" does not violate the FDCPA

Pettit claims that the name "Retrieval Masters Creditors Bureau" is misleading and deceptive because it gives the false impression that the company is a credit bureau. Under the FDCPA, "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt ..." is prohibited. 15 U.S.C. § 1692e(10). The FDCPA also forbids "[t]he false representation or implication that a debt collector operates or is employed by a consumer reporting agency ...." 15 U.S.C. § 1692e(16).

Relevant case law is not extensive. The only FDCPA case that Plaintiff uses to support her claim is *McKenzie v. E.A. Uffman & Assoc., Inc.*, 119 F.3d 358 (5th Cir.1997). In *McKenzie*, a debt collector used the name "Collections Department, Credit Bureau of Baton Rouge," although the collection agency's name was "E.A. Uffman & Associates." *Id.* at 359. The agency claimed it had been "affiliated" with the Credit Bureau of Baton Rouge for fifty years and that the use of the name was not misleading. *Id.* The court disagreed and found that "neither an 'unsophisticated consumer' nor the 'least sophisticated consumer' would discern from this language that the debt collector is actually a wholly distinct entity from the Credit Bureau." *Id.* at 362. *McKenzie* is distinguishable from the case at bar because RMCB is using its real name; it is not attempting to create an affiliation with a

with the United States or any State, including the use of any badge, uniform, or facsimile

thereof."

credit bureau to make itself sound like a credit bureau.

■ Pettit relies upon FTC Official Staff Commentary for the proposition that "[a] debt collector's disclaimer in the text of a letter that the debt collector is not affiliated with ... a consumer reporting agency, will not necessarily avoid a violation if the collector uses a name that indicates otherwise." 53 Fed.Reg. 50097, 50107 (Dec. 13, 1988).[5] The FTC says that "[o]nly a bona fide consumer reporting agency may use names such as 'Credit Bureau,' 'Credit Bureau Collection Agency,' 'General Credit Control,' 'Credit Bureau Rating, Inc.,' or 'National Debtors Rating.'" 53 Fed.Reg. 50097, 50107 (Dec. 13, 1988). RMCB does not incorporate any of these forbidden examples in its name. "Creditors Bureau" is just a part of the name of the company. When asked the definition of a "Creditors Bureau" by Plaintiff's counsel, Russell Fuchs indicated that "[i]n the context of [RMCB's] name, it collects for creditors." (Defendants' 12(n) ¶ 21; Fuchs' Dep. at 77–78.) Plaintiff points out that this "is actually the definition of a debt collection company." (Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment, at 22.) Indeed, RMCB is a debt collection company.

The FTC addressed the issue of possible FDCPA violations by a collection agency named "American Creditors Bureau" in an informal letter. The FTC approved the name, stating that a distinction exists between "credit" and "creditors," and "[a]lthough it may seem a small distinction, it is an important one because consumer reporting agencies are, in the population at large, generally referred to (and thought of) as 'credit bureaus'." Informal FTC Letter, April 1, 1986 (Ex. 2 to Memorandum in Support of Motion for Summary Judgment of Defendant Retrieval Masters Creditors Bureau.)

■ In the same FTC letter, the FTC also made the distinction between an unacceptable collection letter [6] with the name "Credit Rating Bureau, Inc." written prominently in the letterhead and only an "ambiguous" disclaimer in the body of the letter, in comparison with American Creditors Bureau's acceptable letter which had "The ACB Collection Agencies, The Collection Agency With Offices Coast to Coast" in its letterhead beside the words "American Creditors Bureau, Inc." (FTC Informal Staff Letter, (April 1, 1986), Ex. 2 to Memorandum in Support of Motion for Summary Judgment of Defendant Retrieval Masters Creditors Bureau.) Similarly, RMCB's letter appears on letterhead prominently marked with the words "RMCB Collection Agency" written next to "Retrieval Masters Creditors Bureau." The letter states that "your debt is now being handled by debt collectors" and the letter is signed "JOSEPH HOWARD[,] COLLECTION MANAGER." (Collection Letter, Ex. A to Plaintiff's Complaint.) These statements are more than an "ambiguous" disclaimer, and are in fact statements that indicate RMCB is a collection agency. The FTC Commentary about "American Creditors Bureau" is more closely related to this case than those cited by Plaintiff and is more persuasive because it specifically refers to a collection agency with "Creditors Bureau" in its name. The court notes, further, that the FTC has apparently not had any questions about the name of RMCB since 1979 when it originally requested that the company change its name. According to Defen-

---

**5.** Federal Trade Commission Official Staff Commentary is not binding on federal courts or on the FTC itself. *Heintz v. Jenkins,* 514 U.S. 291, 299, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1994). Furthermore, "FTC advisory opinions regarding the FDCPA are entitled to deference only to the extent that their logic is persuasive." *Lewis v. ACB Business Services, Inc.,* 135 F.3d 389, 399 (6th Cir.1998).

**6.** The FTC letter that discusses Credit Rating Bureau's unacceptable collection letter appears in the Plaintiff's exhibits. (FTC Informal Staff Letter (Jan. 26, 1982), Ex. D to Plaintiff's Reply to Defendant Retrieval Masters' Motion for Summary Judgment.)

dants, the FTC did not question the name of RMCB in its 1997 investigation; it only looked at the content of RMCB collection letters. (Defendants' 12(m) ¶ 94; Fuchs' Dep. at 108–111.)

In *Epps v. Etan Indus., Inc.*, No. 97 C 8770, 1998 WL 851488 (N.D.Ill.Dec.1, 1998), the court, in a footnote, disposed of the allegation that the name "Credit Protection Agency" violated the FDCPA. It held that "the name Credit Protection Agency, when used in conjunction with the disclaimer [in the letter] that·it is seeking to collect a debt ... could not lead an unsophisticated consumer to believe that it was offering assistance, [and] does not violate the FDCPA." *Id.* at *6 n. 8. *See Wright v. Credit Bureau of Georgia, Inc.*, 555 F.Supp. 1005 (N.D.Ga.1983) (content of the collection letter would indicate to consumer it was only a dunning letter from a collection agency even though it was named "Credit Bureau" and the firm did have a credit reporting division).

Similarly, this court concludes that an unsophisticated consumer would not be confused after reading the entire letter because the letter clearly indicates that RMCB is a collection agency and not a consumer reporting agency. As another court has observed with respect to a different provision of FDCPA, "[t]he true test remains whether the letter, taken as a whole, would confuse an unsophisticated consumer about his or her rights." *Keen v. Omnibus Int'l, Inc.*, No. 98 C 3947, 1998 WL 485682, at *3 (N.D.Ill. Aug.12, 1998). The overall effect of the letter in question here is that the letter is from a debt collection agency, and that if the recipient does not pay, RMCB will turn her name over to a credit reporting agency.

In *Combs v. Direct Mktg. Credit Servs.*, 98 C 0477 (N.D.Ill.) *aff'd*, 165 F.3d 31 (table, text in WESTLAW), 1998 WL 911691 (7th Cir. Dec.29, 1998), the plaintiff alleged (in part) that the collection agency's name, "Direct Marketing Credit Services," violated the FDCPA because it falsely conveyed the impression that the defendant is a credit bureau. *Id.* at *1. The court held that the plaintiff did not sufficiently allege that the name violated the FDCPA because "[f]irst, the defendant's name does not incorporate any of the terms specifically mentioned in the FTC commentary" [the same commentary Pettit refers to in the instant case]. *Id.* at *2. Second, "the FTC informally approved the name 'Capital Credit Services,' ... and [t]hird, the parties have not cited any relevant case law, and we are aware of none, otherwise indicating a violation of the FDCPA." *Id.* Each of the factors cited by the Seventh Circuit for upholding the motion to dismiss in *Combs* is applicable here. RMCB did not use any of the forbidden terms, the FTC has not objected to the name, and neither the Plaintiff nor this court has found any case law that indicates otherwise.[7]

RMCB was using its real name, not an alias to make itself more formidable to debtors. The name of the company was changed from "Credit Bureau" to "Creditors Bureau" in order to comply with a FTC request. (Defendants' 12(m) ¶ 60.) The letterhead says "RMCB Collection Agency," along with the full name of the firm and the seal of the American Collectors Association. (Collection Letter, Ex. A to Plaintiff's Complaint.) Plaintiff points out that some credit bureaus are both collection agencies and credit bureaus, but the text of the letter involved here makes

7. Plaintiff also relies on trademark cases to demonstrate the similarity between the words "Credit" and "Creditors." *Polaroid Corp. v. Polaraid, Inc.*, 319 F.2d 830 (7th Cir.1963) (injunction entered against used of "Polaraid" brought by "Polaroid"); *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979); *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245 (4th Cir.1970); *Nikon,*

*Inc. v. Ikon Corp.*, 987 F.2d 91 (2d Cir.1993). Although the Seventh Circuit has found trademark cases to be a useful analogy at times, it has also limited the use of trademark cases. *Avila*, 84 F.3d at 227 (distinction between statements that are literally false and statements that convey a false impression or are misleading).

it clear that debt collection is RMB's business: "It is essential that you mail payment in full by 09/12/97 . . . your account is now being handled by debt collectors." (Collection Letter, Ex. A to Plaintiff's Complaint.) The letter is signed "JOSEPH HOWARD[,] COLLECTION MANAGER." The letter warns Pettit that absent payment, her name will be put "on the National Delinquent Debtor File, which could affect [her] ability to obtain certain types of credit with direct marketing companies." (Collection Letter, Ex. A to Plaintiff's Complaint.) Obviously, RMCB is warning that Pettit's name will be turned over to a credit reporting agency if she does not pay promptly. If RMCB was falsely suggesting that RMCB itself was a credit bureau, it would not need to threaten to report her to a credit reporting agency.

Under these circumstances, the court finds that an unsophisticated consumer would not be misled by the name of RMCB and therefore grants summary judgment in favor of the Defendants.

### CONCLUSION

Because Fuchs was not personally, intimately, or directly involved in the alleged violations of the FDCPA he cannot be held personally liable. The Plaintiff's motion for summary judgment against Fuchs is denied, and Fuchs' cross-motion for summary judgment is granted.

Furthermore, RMCB's truthful threat to send Pettit's name to the National Delinquent Debtor File which could have a detrimental effect on her ability to obtain credit from direct marketers does not violate the FDCPA. This court also finds that the use of the name "Retrieval Masters Creditors Bureau" does not violate the FDCPA because it is not misleading to the unsophisticated consumer. Pettit's motion for summary judgment against RMCB is denied. Defendant RMCB's cross-motion for summary judgment is granted.